# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2064

_____

| | | |
|---|---|---|
| Shirley Scales, on behalf of Natashia LaGrone, | * * * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Arkansas. |
| Jo Anne B. Barnhart, Commissioner, Social Security Administration, | * * * | |
| Defendant - Appellee. | * | |

_____

Submitted: November 19, 2003
Filed:  April 8, 2004

_____

Before MELLOY, RICHARD S. ARNOLD, and SMITH, Circuit Judges.

_____

MELLOY, Circuit Judge.

Upon a continuing disability review, the Social Security Administration (the "Administration") determined that Natashia LaGrone, a hearing-impaired minor, no

longer qualified for disability benefits.  The district court agreed.[1]  Because substantial evidence supports the finding that Natashia was not disabled, we affirm.

## I.

Natashia was born on November 22, 1987, with impaired hearing.  In May of 1988, Ms. Scales applied for supplemental security income on Natashia's behalf.  The Administration determined that Natashia was disabled as of May 1, 1988, because she had sensorineural hearing loss and met the listing for hearing impairment.

In March of 1999, the Administration determined that Natashia's hearing had improved, and she was no longer disabled.  Natashia's benefits ceased as of May 1, 1999.  At the time, she was eleven years old and in the fourth grade.  In a 2001 hearing before an administrative law judge, Ms. Scales argued alternatively that Natashia met the listings for hearing impairment and/or mental retardation or that her combined impairments were functionally equal to the listing for mental retardation.  On July 27, 2001, following the hearing, an administrative law judge determined that Natashia no longer met, and neither medically nor functionally equaled, a listed impairment.  At the time of the hearing, Natashia was thirteen years old and in the sixth grade.

The Administration's Appeals Council denied further review, making the administrative law judge's determination the final decision of the Administration.  Ms. Scales then brought this action in the district court.  The district court determined that the Administration's final decision was supported by substantial evidence and affirmed the denial of benefits.

---

[1]The Honorable J. Thomas Ray, United States Magistrate Judge for the Eastern District of Arkansas.

Evidence before the Administration was extensive. Ms. Scales testified that Natashia required close supervision. However, she also testified that Natashia attended both regular and special education classes; wore two hearing aids; rode the bus to school; took no medications; and enjoyed playing basketball. Ms. Scales testified that Natashia's hearing aids were broken, but that she did not have the three hundred dollars necessary to fix them. Natashia stated that the hearing aids helped "a lot."

In a 1998 functional report that Ms. Scales completed for the Administration, Ms. Scales checked boxes to indicate whether Natashia's impairment interfered with various areas of learning and daily life. Ms. Scales indicated Natashia could deliver telephone messages; repeat stories she had heard; tell jokes or riddles accurately; use sentences with "because," "what if," or "should have been"; talk with family and friends; read capital and small letters; read simple words; read and understand stories in books or magazines; print some letters; print her name; spell most three to four letter words; add and subtract numbers over ten; understand days of the week and months of the year; and understand money well enough to make correct change. Ms. Scales also indicated that Natashia could not tell time; explain why she did things; write in script; read and understand simple sentences nor write a simple story with six to seven sentences. Finally, Ms. Scales indicated that Natashia's physical abilities were not limited and that Natashia's impairment did not affect her behavior with other people, limit her ability to help herself and take care of her personal needs, nor limit her ability to pay attention and stick with a limited task.

School records indicated that Natashia performed at grade level in math but had difficulty with language skills. In February of 1999, a teacher stated that Natashia (then eleven) was in the fourth grade, functioned at the fourth grade level in math, functioned at the third grade level for reading, had no significant problems with articulation or language, attended regular classes for some subjects, and attended special education classes for reading and speech. For the following school year, her

teachers recommended that she attend regular classes at the fifth grade level for reading, math, science, social studies, physical education, music and library, but that she attend special education classes for language and spelling and receive 30 minutes of speech therapy each week.

In November and December of 1999, when Natashia turned twelve and was in the fifth grade, her teachers stated that she had no significant problem with articulation. One teacher stated that her language impairment interfered with her progress, but another teacher said Natashia had no significant problem with language. On balance, Natashia's teachers painted a more favorable picture of Natashia's abilities than did Ms. Scales and described improvement in Natashia's language skills.

In the spring of 1998, when Natashia was ten years old, she received an age equivalency rating of five years, seven months in the area of receptive language skills on a speech and language evaluation. Based on this rating, and other test results, the examiner recommended that Natashia continue with speech therapy. In a June 1998 speech and language evaluation, Natashia received an age equivalency rating of four years, nine months on the Peabody Picture Vocabulary Test. Natashia's scores in other areas of speech and language were not as poor. The examiner for the June evaluation stated, "Natasha [sic] was considered to have a severe language disorder in receptive and expressive language areas. She did not have an articulation problem. These problems related to her hearing impairment which negatively affects language skills."

Medical evidence demonstrated an improvement in hearing between 1988 and 1998. In 1988, Natashia heard at the 50 decibel (db) level. In 1998, she could hear at the 31 db level with 80% speech discrimination in the left ear and 76% speech discrimination in the right. The examiner at the time said Natashia had normal speech volume, had a severe language disorder in the receptive and expressive areas, but did

not have an articulation problem. In 1999 an audiologist measured Natashia's unaided hearing in the left ear at the 33 db level.

In January of 2000, a psychological examination revealed that Natashia's verbal IQ score was 54, her performance IQ score was 77, and her full-scale IQ score was 62. A valid verbal IQ score of 54, standing alone, may be sufficient to meet listing 112.05 for mental retardation. See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.05 (defining the listing of mental retardation as being "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning. The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied. . . . C. A valid verbal, performance, or full scale IQ of 59 or less; D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant limitation on function."). Notwithstanding these scores, the psychologist who administered the IQ test and conducted a psychological examination of Natashia determined that Natashia was *not* mildly mentally retarded because the discrepancy between the verbal and quantitative scores demonstrated that Natashia's hearing impairments interfered with her verbal reasoning ability. The psychologist suggested a learning disorder rather than mental retardation as the diagnosis:

> Natashia La Grone is a 12 years 1 month old African-American female, whose overall intellectual functioning was found to be within the mildly deficient range. However, it should be noted that the test results reflect a wide discrepancy between verbal and performance ability, with deficits in the verbal area of ability compromising her overall functioning. It is believed, that deficits in her ability to hear, interfere with her verbal reasoning ability, as well as her ability to communicate effectively. Current test results are suggestive of a learning disability, as supposed [sic] to mental retardation. While severe deficits in the area of communication were noted, only mild deficits in adaptive behaviors in the area of concentration, persistence and pace, as well as social and interpersonal skills (inappropriate behavior in the classroom) were

revealed. Consequently, a diagnosis of mild mental retardation is not warranted. Natashia's interest[s] are age appropriate, she does have preferred female friends her own age, and appears to have adequate social skills. While she is a slow worker, she is able to complete tasks if given extra time. There was no evidence of poor frustration tolerance or distractibility that would interfere with her ability to complete tasks. Within the areas of physical development and personal responsibility no evidence of delay was revealed.

The Administration evaluated the record as a whole, and relied, in part, on the psychologist's conclusions to find that Natashia did not meet listing 112.05(C) or (D) for mental retardation. Ultimately, the Administration determined that the low raw scores on the IQ test were not *valid* IQ scores for the purpose of meeting the listing for mental retardation under listing 112.05(C) or (D). Based on her 1998 and 1999 auditory tests, it was clear that she did not meet the listing for hearing impairment. Looking at Natashia's medical evidence as well as evidence of her ability to function in school and in everyday life, the Administration determined that Natashia had a severe hearing impairment and a learning/language disorder, but did not medically nor functionally equal a listed impairment.

On appeal to this court, Ms. Scales argues only that Natashia's hearing limitation, combined with her borderline intelligence and language and learning difficulties, results in an "extreme" limitation in the domain of acquiring and using information and, therefore, qualify Natashia as functionally equal to the listing for mental retardation. Ms. Scales raised this argument below. The Administration considered this argument when it denied benefits.

II.

Our review is deferential, and we do not substitute our own view of the evidence for that of the Administration. Rather, we affirm the findings of the

Administration if supported by substantial evidence on the record as a whole. <u>Dixon v. Barnhart</u>, 353 F.3d 602, 604 (8th Cir. 2003).

We recently described the sequential analysis applicable to childhood disability determinations. <u>See</u> <u>Pepper ex rel. Gardner v. Barnhart</u>, 342 F.3d 853, 854 (8th Cir. 2003). Because Ms. Scales's argument on appeal addresses only the step of functional equivalency, we discuss only this step of the analysis. Under this step, we consider a child disabled if she suffers functional limitations equivalent in severity to limitations associated with a listed impairment. 20 C.F.R. § 416.926a(a).

We may find functional equivalency to a listed impairment if a child has an extreme limitation in at least one functional domain, or "marked" limitations in at least two such domains. <u>Id.</u> An extreme limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). "'[E]xtreme limitation' does not necessarily mean a total lack or loss of ability to function. It is the equivalent functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." <u>Id.</u>

The only functional domain at issue in the present case is the domain of acquiring and using information. 20 C.F.R. § 416.926a(b)(1)(i). Under this domain, we examine how well a child acquires, learns, and uses information. Ms. Scales argues that Natashia barely missed meeting the listings for mental retardation and hearing impairment and suffers from a learning and language disorder. Ms. Scales concludes that this evidence mandates a finding that Natashia suffers an extreme limitation in the domain of acquiring and using information.

While Natashia's raw IQ scores were low, the psychologist found that these raw scores did not appropriately reflect her overall intelligence given the wide discrepancy between her vocabulary and performance scores. Accordingly, the

psychologist determined that a diagnosis of a learning disorder was more appropriate than a diagnosis of mild mental retardation. The Administration concluded that the psychologist's explanation meant Natashia's raw IQ scores were not valid. This conclusion is reasonable in light of the psychologist's explanation and, therefore, is supported by the evidence.

Even if valid, however, Natashia's verbal IQ score was 54, her performance IQ score was 77 and her full-scale IQ score was 62. "IQ scores in listing 112.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15, e.g., the Wechsler series." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 112.00(D)(9). Three standard deviations below the mean on the Wechsler series is 55. Having one raw score at the borderline of three standard deviations below the mean does not *require* a finding of an extreme limitation. 20 C.F.R. § 416.926a(e)(3)(iii) ("We will find that [a child] has an 'extreme' limitation [if the child has] a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, *and* [the child's] day-to-day functioning in domain-related activities is consistent with that score.") (emphasis added). Rather, we consider test scores together with the record as whole and look at a child's ability to perform in daily life, school, etc. See 20 C.F.R. § 416.926a(e)(4)(iii)(B) ("Generally, we will not rely on a test score as a measurement of your functioning within a domain when the information we have about your functioning is the kind of information typically used by medical professionals to determine that the test results are not the best measure of your day-to-day functioning.").

Regarding Natashia's hearing, the evidence does not suggest a continued impairment that, alone or in combination with borderline mental abilities, justifies a finding of functional equivalency to a listed impairment. In her most recent tests, Natashia exhibited greater than 75% speech discrimination in both ears and heard at

the 31-33 db level. The listing for hearing impairment for a child over the age of five, listing 102.08B, defines a hearing impairment as:

1. Inability to hear air conduction thresholds at an average of 70 decibels (db) or greater in the better ear; or
2. Speech discrimination scores at 40 percent or less in the better ear; or
3. Inability to hear air conduction thresholds at an average of 40 decibels (db) or greater in the better ear, and a speech and language disorder which significantly affects the clarity and content of speech and is attributable to the hearing impairment.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 102.08B. Natashia's hearing tests demonstrate that she could hear at levels well below the listing's limits and that her speech discrimination was much better than the listing's threshold. Further, Natashia testified that her hearing aids helped, teachers testified that she frequently failed to wear the hearing aids, and Ms. Scales failed to fix or replace Natashia's hearing aids although one or both had been broken for a long period of time (and had been broken but unrepaired when Natashia still received benefits). An impairment that is controllable does not support a finding of a disability, and a "'failure to follow a prescribed course of remedial treatment without good cause is grounds for denying an application [for] benefits.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997)); 20 C.F.R. § 416.930(a). Accordingly, evidence of Natashia's hearing abilities did not mandate a finding of ongoing functional limitations in the domain of acquiring and using information.

Looking not only at the test results from Natashia's psychological exam and auditory exams, but at the record as a whole, we find the Administration's decision supported by substantial evidence. Natashia performed adequately in many subjects and could read and write simple words and sentences, read and understand stories in

magazines and books, make change, play sports, and interact appropriately with children her own age. Natashia's school placed her in regular classes for many subjects including science, social studies, and math. Her hearing was improved, her school was addressing her language difficulties with some success, and evidence outside her IQ tests reinforced the Administration's conclusion that the raw test scores were not valid. Although the evidence might have been sufficient to support a finding of continued disability, our review is limited and the evidence clearly supports the Administrations findings. See Dixon, 353 F.3d at 604 ("'If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner.'") (quoting Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996)).

The judgment of the district court is affirmed.

_____